DAVID EISENBERG
**DAVID EISENBERG, P.L.C.**
2702 N. Third Street
Suite 4003
Phoenix, Arizona 85004
Arizona State Bar No. 017218
Telephone: (602) 279-5076
Email: david.eisenberg@azbar.org

Attorney for Defendant Raymond Herder

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | CR 14-8193-PCT-GMS |
|---|---|
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING MEMORANDUM** |
| Raymond Herder, | |
| Defendant. | **(Sentencing Set for August 24, 2015)** |

The Defendant Raymond Herder, by and through undersigned counsel, respectfully submits the Defendant's Sentencing Memorandum, in which the Defendant offers support for his requested sentence of ten years, the statutory minimum in this case. The following addresses the most relevant sentencing factors in 18 U.S.C. §3553(a).

**I.  Sentencing Factors**

   A.     Nature and Circumstances of the Offense

The Defendant perpetrated a crime of violence in a drunken stupor. Voluntary intoxication is not a defense to a general intent crime, *United States v. Sneezer*, 900 F.2d 177, 179 (9th Cir. 1990), and discharging a firearm requires proof only of a general intent. *United States v. Dare*, 425 F.3d 634, 641, n. 3 (9th Cir. 2005). Nonetheless, there is no prohibition in considering alcohol abuse as a mitigating circumstance in determining an appropriate sentence. Moreover, the Defendant does not seek to mitigate his sentence in the sense that the Court should "depart" below the statutory minimum of ten years, a legal impossibility. The defense does, however, maintain that Herder's inebriation to the point of not recalling what he was doing when he shot

Officer Gregg is one reason not to impose a sentence of 15 years, as recommended by the United States Probation Office ("USPO") in its presentence investigation report ("PSR").

### 1. Events Leading to the Shooting

Herder's family has confirmed that he had been drinking throughout the day of the offense. (PSR, ¶ 41.) In the early morning, around 7:00 or 8:00 a.m., Herder called Rosalie, his wife, who was visiting some children in Salt Lake City, Utah. As she recounted, he was "already drunk." She could tell because he had slurred speech. He asked for money. Later that morning, Rosalie called Herder's cell phone number. A daughter, Raneesha, answered. She told her mother that Herder was at the house of a particular individual, whom Rosalie recognized as a local bootlegger. Herder got on the line, and to Rosalie he was even drunker than earlier. He was also angry over the money. (Disc. 39-40.) [1/]

Later, Raneesha and one of the Herders' sons told Rosalie that Herder had two water bottles, which she knew meant that he had gotten 2 containers of bootleg whiskey. When Herder learned that Roshana, another one of their daughter's, had been arrested that day, he "guzzled" the two bottles, one after the other and got made. He was drunk when he said he "was gonna shoot the cop that took my baby." (Disc. 41.) One of Herder's sons, who was home when Herder found out that Roshanna had been arrested, heard his father ask "Why did they arrest her?" His father got mad. (Disc. 23.)  As Rosalie told the FBI, she believed that Herder's actions that day were the possible result of toxic alcohol he obtained from the bootlegger. (Disc. 30.)

The scene at the home was so chaotic over Herder's actions and drunkenness that Rosalie called the Tuba City police, requesting that Herder be removed from the property because he had been drinking and making "donuts" (apparently circle eights) in his vehicle at the property. This call brought Officer Gregg to the premises. When he arrived, Herder was not there, but daughter Roshana was home. A records check indicated that there was an outstanding tribal warrant for her, so Officer Gregg arrested her and transported her to a relay point where other officers could

---

[1/] The reference to "Disc." pertains to Bates-numbered documents produced by the government pursuant to Rule 16, Fed.R.Crim.P., during discovery.

2

1  take custody of her. A few minutes after the transfer, Officer Gregg received further word from
2  the dispatcher that Herder had returned to the premises. (Disc. 27-28)

    2.    The Arrest

4  The Defendant did not go looking for an officer to shoot.

5  When dispatch informed Officer Gregg that Herder was back at the property, the officer
6  drove there. He saw Herder's truck. The officer parked in front of the trailer home. He got out
7  of his cruiser, approached the front door of the trailer and walked up to the front steps. When he
8  was about 10 feet away, the trailer door opened. The officer saw Herder, who was holding a
9  pump-action shotgun. Herder fired one shot, which struck the officer in the head. Then, the
10 officer fired twice at Herder. The officer ran for cover and called dispatch for help. (Disc. 28-
11 29.) It does not appear that the Officer told Herder to come out of the trailer.

12 The projectile that hit the officer was birdshot. (Disc. 22.) [2]  Officer Gregg has described
13 the effect on him of the shooting, stating how it has impacted his health and his job. (PSR, ¶ 8.)

14 Herder was shot in the face. (Disc. 22.) He spent three weeks at St. Joseph's Hospital. The
15 bullet is still lodged in his face. He has lost hearing in his right ear and has limited sight in his
16 right eye. (PSR, ¶ 37.) As he explained to the USPO, doctors have told him that the bullet cannot
17 be removed because of the possible fatal consequences of such an operation.

    3.    Herder's Mindset

19 Herder does not remember the actual events of the shooting. As he stated during his
20 interview with the USPO, "I didn't plan to do such a thing." "I guess I was under the influence."
21 "All I know is that I woke up in the hospital." He also wrote as much to the Court, stating in his
22 letter that "I never meant to disrespect Mr. Greg[g]."

23 For his actions, Herder is extremely remorseful. In the same letter to the Court, he wrote, "I
24 also caused much harm to Mr. Greg[g] and his family." "I regret and am very ashamed of what

---

[2] Projectiles described as "birdshot" are designed for hunting game birds. "Buckshot" is a larger projectile used to hunt larger animals, such as deer and pigs. *See,* wiseGEEK, July 26, 2015.

3

I've done." He also told the USPO during his interview that "It hurts my heart to know I did this."

### B. History and Characteristics of the Defendant

#### 1. Herder's Alcohol Abuse

Herder has a history of conduct inspired by drink. He has arrests and, in some cases, convictions ranging from public intoxication to driving while under the influence to aggravated DUI, in 1996, 2000, 2005, 2010, 2011, 2014. (PSR, ¶¶ 14, 15, 16, 22, 24, 25 & 26.) In one instance, the Defendant's breathalyser test registered a 0.312% (PSR, ¶ 16), enough of a reading to result in a "super extreme" DUI conviction alone. ARS 28-1282. Indeed, alcohol appears to have been the root of all the Defendant's problems with law enforcement. His records do not reflect any other crimes, except for disorderly conduct, and the USPO noted in its Justification section that all of Herder's prior offense conduct was alcohol related. (PSR, p. 14.)

Herder started drinking when he was 15. He would drink to intoxication. At one point, he became sober and stayed that way for about 7 years, from about 2001. But, eventually, he started drinking again, relying on "homemade" liquor. (PSR, ¶ 39.) When he was at home, Herder drank. He had been drinking just prior to the incident, but he was so drunk, "I don't remember the circumstances."

#### 2. Herder's Better Nature

Herder's family life displays his redeemable nature. Nearly every one of the character letter writers portray him as a helpful husband, father, brother and neighbor. He has been a home maker for his children and grandchildren and particularly a mentor to his sons. He helps others, including the elderly and disabled, by hauling wood and carrying water and simply by caring for them..

If Herder was a pathological individual who created havoc in his community, he would not have the characteristics of the caring person that the letters show him to be.

### C. The Kinds of Sentences Available; The Guideline Sentence

As the USPO correctly notes, the guideline sentence is the same as the statutory requirement of a minimum term of ten years. (PSR, ¶ 11, citing USSG §2K2.4(b). It has recommended that the Court enter a sentence of 15 years based on the violent nature of the event and because the offense is his fourth felony conviction. (PSR, ¶ 65, Justification [p. 14].) It also cites the impact of the dismissal of Count 1 of the indictment. (PSR, ¶ 61.) The Defendant disagrees with the position of the USPO and disputes the reasons for recommending a sentence above the statutory minimum,

First, the guidelines offer no indication how the nature of the commission of the offense of discharging a weapon during a crime of violence should be increased due to its circumstances. The guidelines provide that the range for any conviction under Section 924( c) is "the minimum term of imprisonment required by statute." USSG §2K2.4(b). Moreover, the guidelines further provide that Chapters 3 and 4 shall not apply. (*Id.*) Consequently, such adjustments as vulnerable victim, official victim, role in the offense and Grouping (Chapter 3) do not apply. Nor is criminal history a consideration (Chapter 4). Accordingly, an enhanced sentence based on departure principles is not part of the guideline concept.

Second, although the guideline range for this offense is the minimum term, it is helpful to consider the guideline range for the count to be dismissed. Section 3553(b) of Title 18 provides that in the absence of an applicable guideline "the court shall also have due regard for the relationship of the sentence imposed to sentences prescribed by guidelines applicable to similar offenses . . ." Even conceding that Herder did have the requisite intent to commit an assault with the intent to murder, Count 1 is sufficiently comparable to Count 2, that it should be considered as an appropriate range for sentencing. [3]

Assault with the intent to commit murder is seemingly a more terrible crime than discharging a firearm during a crime of violence, but the guideline range for Herder would have been less. In his case, the range is 97 to 121 months in prison. (PSR, ¶ 61.)

---

[3] *See, also*, USSG 2X5.1, which provides that "[i]f the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline."

1    Yet a plea to Count 1 was not an available outcome for Herder.  Assault with the intent to commit murder requires proof of the specific intent to kill another.  *United States v. Jones*, 681 F2d 610, 611 (9th Cir. 1982.)  Herder could not admit to the intent element of attempted murder because he was too intoxicated to recall what happened.  He simply could not as a matter of his own conscience admit that he intended to kill Officer Gregg.  Moreover, as *Jones* also points out, "[a]cting with malice by committing a reckless and wanton act without also intending to kill the victim is not sufficient for conviction."  (*Id.*)   This type of conduct may have better fit the circumstances here, but, as noted, it would not have fulfilled the required element of intent.

    Third, the USPO states that stacking the two charges together, which would produce a total sentence of 241 months, shows the benefit to the Defendant of the plea agreement.  As the USPO also correctly notes, pursuant to 18 U.S.C. § 924(c)(1)(A)(iii) a conviction for  discharging a weapon during a crime of violence would run consecutively to a conviction for the underlying offense.  (PSR, ¶¶ 61, 64.)  However, as Section 3553(b) provides, the sentencing court should consider a comparable charge, which as discussed above, is Count 1, assault with intent to commit murder.

    Fourth, the violent nature of the act is subsumed within the statute itself, as it requires proof of a crime of violence.  The evidence here does not portray Herder as acting so violently that a heavy sentence is warranted.  The Defendant did not stalk Office Gregg; nor did he concoct a plan over time to shoot him.  Indeed, Herder's anger over the arrest of his daughter arose on the day of the offense.  The shotgun projectile was birdshot, rather than the more devastating buckshot.  The bootleg liquor Herder downed does not excuse the conduct, but it does mitigate the need to punish him harshly.

    D.    <u>Seriousness of the Offense; Respect for the Law; Just Punishment</u>

    Section 3553(b) also provides that the court shall consider the factors in Section 3553(a)(2) in the absence of an applicable guideline range.

If the guideline ceiling for assault with the intent to commit murder in this instance tops out at 121 months, then such a sentence is a just measure of punishment in this case. It would not undermine the respect for the law and does not dilute the seriousness of the offense.

E. <u>Protection of the Public from Further Crimes by the Defendant</u>

There is no indication from Herder's past that he is a violent man. Drink has played a role in his prior conduct, but he is not normally an aggressive man bent on intentionally causing harm to others.

F. <u>Deterrence</u>

Herder's expressions of remorse certainly indicate that he will not commit an offense like this again. With a ten year sentence, even with good time served, Herder will be 60 years old when he leaves prison. As studies have shown, the older the individual on release from prison, the less likely he will be to commit another crime.

**II. <u>Conclusion</u>**

A sentence of ten years for Herder is sufficient but not greater than necessary to accomplish the goals of sentencing. The Defendant respectfully submits that such a sentence is appropriate in these circumstances.

Respectfully submitted this 18th day of August, 2015.

*s/ David Eisenberg*

DAVID EISENBERG
Counsel for Defendant Raymond Herder

I hereby certify that on August 18, 2015, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Roger Dokken, Esq.
Assistant U. S. Attorney
Counsel for the United States of America

*David Eisenberg*